Filed 7/18/23 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| DIVINE FOOD AND CATERING, LLC,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>WESTERN DIOCESE OF THE ARMENIAN CHURCH OF NORTH AMERICA et al.,<br><br>    Defendants and Respondents. | B321087, B321605<br><br>(Los Angeles County Super. Ct. No. 21STCV38713)<br><br>ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING (NO CHANGE IN JUDGMENT) |

THE COURT:

The opinion filed June 28, 2023 is modified as follows:

1. On page 3, in the first sentence of the second full paragraph, "actual judgments and rulings on dispositive motions" shall be changed to "actual judgments and rulings on motions".

2.     On page 21, the first sentence of the first full paragraph shall be changed from "Unlike in *Hart*, the unlawful detainer court in the instant case never denied a motion for judgment, nor indeed denied any dispositive motion at all." to "Unlike in *Hart*, the unlawful detainer court in the instant case never denied a motion for judgment."

3.     On page 23, the first full paragraph, beginning "Also, to the extent trial events . . . ," shall be deleted in its entirety.

4.     On page 24, in the first full sentence, "When the trial court denies a dispositive motion" shall be changed to "When the trial court rules on a motion".

5.     On page 24, in the first sentence of the first full paragraph, "For all these reasons" shall be changed to "For these reasons".

There is no change in judgment.  Respondents' petition for rehearing is denied.

CERTIFIED FOR PUBLICATION.

_____
ROTHSCHILD, P. J.          CHANEY, J.          BENDIX, J.

2

Filed 6/28/23 (unmodified opinion)
**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| DIVINE FOOD AND CATERING, LLC, | B321087, B321605 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. 21STCV38713) |
| v. | |
| WESTERN DIOCESE OF THE ARMENIAN CHURCH OF NORTH AMERICA et al., | |
| Defendants and Respondents. | |

APPEAL from orders of the Superior Court of Los Angeles County, Curtis A. Kin, Judge. Reversed.

Reed Smith, Raymond A. Cardozo; SYLG, Susan C. Yu, Eric M. Lode and Farah Tabibkhoei for Plaintiff and Appellant.

Buchalter, Harry W.R. Chamberlain II, Robert M. Dato, Michael Muse-Fisher; Kabateck, Brian S. Kabateck and Shant A. Karnikian for Defendants and Respondents.

_____

Divine Food and Catering, LLC (Divine) appeals from the dismissal of its malicious prosecution complaint against defendants and respondents the Western Diocese of the Armenian Church of North America (the Diocese), St. John Armenian Church (St. John), Archpriest Manoug Markarian (Archpriest Manoug)[1], and Harout Markarian (collectively, defendants).  The trial court dismissed the complaint after granting defendants' special motion to strike under Code of Civil Procedure[2] section 425.16, the anti-SLAPP statute.

Divine was a commercial tenant of St. John's banquet hall.  In 2018, St. John and the Diocese (the church entities) filed an unlawful detainer action seeking to evict Divine based on a purported oral month-to-month lease.  Divine asserted as a defense a superseding written lease, the existence of which the church entities denied.  Following trial, the unlawful detainer court found the written lease was valid and granted judgment for Divine.

Divine then filed its malicious prosecution complaint, alleging defendants brought the unlawful detainer action in order to extort money from Petros Taglyan, the father of Divine's owner.  Divine alleged defendants had no probable cause to bring

_____

[1] Respondents refer to Manoug Markarian as Archpriest Manoug in their briefing, and we shall do the same.

[2] Unspecified statutory citations are to the Code of Civil Procedure.

the unlawful detainer action because they knew there was a valid written lease, but attempted to conceal its existence.

Defendants filed an anti-SLAPP motion. Defendants relied on the interim adverse judgment rule, which provides that certain determinations by the trial court in the underlying action establish as a matter of law probable cause to bring that action, thus foreclosing a malicious prosecution suit. Defendants contended that the unlawful detainer court's statements early in the trial that the church entities had made their "prima facie" case for an oral month-to-month lease triggered the interim adverse judgment rule. The trial court agreed and granted the anti-SLAPP motion.

We hold that the triggers for the interim adverse judgment rule are limited to actual judgments and rulings on dispositive motions. The trial court therefore erred by applying the rule based on the unlawful detainer court's sua sponte comments during trial. Alternatively, Divine has made an adequate showing for anti-SLAPP purposes that the unlawful detainer court's comments were the product of fraud or perjury, which precludes application of the interim adverse judgment rule.

Defendants have shown no other valid basis to support their anti-SLAPP motion. Accordingly, we reverse.

## BACKGROUND

St. John is a parish church of the Diocese, a branch of the Armenian Apostolic Church. The head priest of St. John is Archpriest Manoug.

3

In 2003, parishioner Petros Taglyan[3] either gave or loaned the Diocese and St. John $300,000 so the Diocese and St. John could lease a property adjacent to St. John. Petros also financed the construction of a banquet hall on the newly leased property and agreed to operate and maintain the hall. In 2009, Petros turned over operation of the hall to Divine, a catering business run by Petros's son Gary.

## 1. *Unlawful detainer complaint*

On October 22, 2018, the church entities filed a verified form unlawful detainer complaint seeking to evict Divine and Petros from the banquet hall.[4] The complaint characterized Divine's tenancy as subject to an oral, month-to-month lease entered into by Petros in October 2007, with a monthly rent of $6,300. The complaint further alleged that, pursuant to that month-to-month arrangement, the church entities had served Divine and Petros with a 30-day notice to quit. The complaint was verified by Harout Markarian, who was the executive director of the Diocese and Archpriest Manoug's son.

Divine and Petros filed an answer denying all allegations. Among other affirmative defenses, Divine and Petros alleged that a written lease dated May 1, 2009 entitled Divine to possession of the banquet hall until 2039, and superseded any purported oral lease.

---

[3] Because this case involves both Petros Taglyan and his son Gary Taglyan, for clarity we refer to them by their first names. No disrespect is intended.

[4] Although Petros was never dismissed from the unlawful detainer action, he testified that he was not a tenant and disclaimed any possessory interest in the banquet hall.

4

In support of their answer, Divine and Petros produced a document purporting to be a written lease between St. John and Divine dated May 1, 2009.  The lease provided for a monthly rent of $15,000, and extended to April 2039.  The document appeared to bear Archpriest Manoug's signature.

Divine and Petros also produced a document purporting to be an earlier written lease between St. John and Divine dated October 1, 2007, and extending through October 1, 2021, for a monthly rent of $4,500.  This document also appeared to bear Archpriest Manoug's signature and his initials on each page.[5]

Divine and Petros served requests for admission on the church entities, asking them to admit, among other things, that St. John had entered into the 2009 lease with Divine, that Archpriest Manoug had signed the lease on St. John's behalf, and that the 2009 and 2007 leases produced by Divine and Petros were genuine.  The church entities uniformly denied each of these requests.

## 2.    *Unlawful detainer trial*

The unlawful detainer action proceeded to trial.  The unlawful detainer court[6] announced at the outset it would

---

[5] Evidence at trial indicated the lease dated 2007 actually was executed in 2014, but was backdated to the opening of the banquet hall in October 2007.  Similarly, the lease dated 2009 was executed in 2015, but backdated to 2009 when Divine took over operation of the hall.

[6] In this opinion we refer to the court that presided over the unlawful detainer action as the "unlawful detainer court," and the court that presided over the malicious prosecution action and granted the anti-SLAPP motion as the "trial court."

"bifurcate" the proceedings, first deciding "whether or not [the church entities] had a right to actually serve a 30-day notice or not." The court referred to this first issue as "phase one."[7] If the church entities prevailed on that issue, the court would then "hear other issues of possible defenses, retaliation, extortion, whatever you want . . . and then I'll hear the issue of damages."

The church entities first called Petros as a witness under Evidence Code section 776.[8] After questioning Petros over two days, the church entities' counsel indicated his examination was complete. As counsel for Divine and Petros was about to begin her questioning, the unlawful detainer court interjected that the church entities had not "met their prima facie case yet," meaning they had not established through Petros the existence of the oral month-to-month lease upon which the unlawful detainer action was based.

The church entities' counsel proceeded to ask additional questions of Petros regarding the terms of his agreement with St. John when he first began operating the banquet hall in 2007, and the unlawful detainer court asked Petros a number of questions as well.

After hearing Petros's additional testimony, the unlawful detainer court summarized it, stating, "[Petros is] saying he had an agreement with the church . . . that he would loan them . . . $6,300 at minimum every month; . . . and that money would be used to pay the rent on the actual lease. [¶] . . . I guess one way

_____

[7] The trial court did not refer to the first issue as "phase one" when it announced its intent to bifurcate, but used that term in later colloquies.

[8] Evidence Code section 776 allows a party to call an adverse party as a witness. (Evid. Code, § 776, subd. (a).)

you could look at it—because he's paying it with his funds out of the church funds . . . to the actual landlord, [is that] he's kind of a subtenant, and he's taking on the responsibilities of the rent." As further indication that Petros was akin to a subtenant in 2007, the court noted that Petros was "the one who's occupying the premises, . . . [o]r building it, and . . . using it."

Petros disputed the unlawful detainer court's characterization of the arrangement, stating he was not a tenant or subtenant. The unlawful detainer court disagreed, stating the church entities "probably did make that prima facie case" of the original month-to-month agreement. The court continued, "So unless [Divine and Petros] show that . . . there's a subsequent agreement that supersedes [the oral agreement], then [the church entities] probably do have a right to evict them on a 30-day notice."

Counsel for Divine and Petros then proceeded to examine Petros. Amidst that examination, the court and counsel had a colloquy regarding, inter alia, the significance of a loan agreement between St. John and Petros and how it affected any purported oral tenancy. The court, echoing its earlier statements, stated, "I'm satisfied that initially, in my opinion, [Petros] had some sort of . . . leasehold interest in the property, either oral and/or written or de facto, and that he maintained and controlled the property. He built it. He started operating it. I mean, just look at reality."

The court further stated, "I'm satisfied at least [the church entities'] prima facie case has been established. . . . [I]t's going to come down to whether [Divine and Petros] can convince me that the written agreement was signed and it was authorized or needed to be authorized or there was detriment or any of the

7

legal issues." After further colloquy, the court stated, "I've already made that tentative finding. [The church entities] established some sort of tenancy with [Petros] . . . and . . . he had maintained control and possession of the premises and could do certain things under certain conditions. I'm satisfied that it started with him." The court told counsel for Divine and Petros, "Where you need to come is show me how that was subsequently changed . . . by the written lease."

Counsel for Divine and Petros completed her examination of Petros and the church entities' counsel conducted his redirect examination. The church entities then called an expert who opined regarding the authenticity of Archpriest Manoug's signature on the written leases.

At this point in the trial, although the church entities had yet to call all their witnesses, the unlawful detainer court allowed Divine and Petros to call several witnesses out of order for scheduling reasons. Those witnesses testified in relevant part as follows. A consultant testified he had used the 2007 written lease in applying for a liquor license for Divine in 2014 or 2015, and authenticated a copy of that lease from his files. A former Divine employee testified that in 2016 she needed the 2009 lease as part of her work visa application, and Archpriest Manoug personally handed her a copy. The paralegal that prepared the former Divine employee's visa application testified he received a scanned copy of the 2009 lease via e-mail in 2016, and authenticated the e-mail chain containing that copy. A forensic document examiner opined it was "highly probable" the signatures on the 2007 and 2009 leases were Archpriest Manoug's.

The church entities then called Gary Taglyan. During cross-examination by counsel for Divine and Petros, Gary

testified he witnessed Archpriest Manoug sign the 2007 lease and initial every page.

Following Gary's testimony, the unlawful detainer court stated, "Beyond a reasonable doubt, I'm convinced that [Archpriest Manoug] signed [the 2009 lease] and it was created before 2016." The court stated the remaining issue was whether Archpriest Manoug had the authority to sign the lease on behalf of the church entities. The court stated if Archpriest Manoug wished to testify that he never signed the leases, the court would "listen to him with an open mind. But I think the evidence is pretty clear . . . ."

On the next day of trial, the church entities called Archpriest Manoug to testify.[9] Archpriest Manoug denied signing either the 2007 lease or 2009 lease.

After the unlawful detainer court rejected the church entities' final witness, a church secretary, under Evidence Code section 352,[10] the church entities rested "as to phase 1 only."

As soon as the church entities rested, the trial court stated it would entertain a motion for judgment under section 631.8. Divine and Petros made the motion. The trial court summarized the issues: first, whether there was a written lease signed by Archpriest Manoug; second, whether that written lease was

---

[9] The church entities first called Harout Markarian. His testimony is not relevant to the issues on appeal and we do not summarize it.

[10] The unlawful detainer court accepted an offer of proof that the secretary would testify that during the period when the former Divine employee claimed to have obtained a copy of the 2009 lease from Archpriest Manoug, the church's office records were boxed up.

enforceable, either because Archpriest Manoug had actual or ostensible authority to sign it, or because principles of equity precluded the church entities from challenging the validity of the lease.

After hearing argument, the trial court granted the motion for judgment and issued an oral statement of decision. The court found Archpriest Manoug "signed both leases at issue. I find that beyond a reasonable doubt. [¶] It's very unfortunate that [Archpriest Manoug] chose to testify. Hopefully, [he] just forgot. There's no doubt in my mind that [he] signed it. The evidence is overwhelming." In support of this conclusion, the court cited the testimony of the liquor license consultant, the former Divine employee, the paralegal, and the handwriting expert called by Divine and Petros. The court found the church entities' handwriting expert unqualified, stating if Divine and Petros "had objected, I wouldn't have allowed him to even testify."

The trial court stated it "didn't believe [Archpriest Manoug] at all. I did not find him to be credible at all. . . . [¶] And I think he's just covering himself because he realizes, if he was supposed to have done something, maybe he needs to cover his butt at this point."

The trial court further found Archpriest Manoug had actual and, in the alternative, ostensible authority to enter into the 2009 lease. Assuming arguendo he did not, the court found the church entities had waived or were estopped from asserting any such argument, given they had "actual or constructive notice that [Archpriest Manoug] did sign these leases," and had not objected to Divine's presence in the banquet hall until 2018.

The trial court therefore ruled the 2009 lease was the operative lease, and the church entities therefore could not evict

10

Divine based on a 30-day notice to quit. The court entered judgment for Divine and Petros.

Divine and Petros moved for cost of proof sanctions based on the church entities' denials of the authenticity of the 2007 and 2009 leases. The trial court granted sanctions of $43,400 in attorney fees and expert costs. The court found sanctions were appropriate "because, in my opinion, the weight of the evidence, overwhelming weight of the evidence, is that [Archpriest Manoug] signed [the lease], and he knew it, and he was covering it up."

We affirmed the judgment and the sanctions order in an unpublished opinion. (*St. John Armenian Church v. Divine Food and Catering, LLC* (Jul. 30, 2021, B298437) [nonpub. opn.].)

### 3. *Malicious prosecution action and anti-SLAPP motion*

On October 20, 2021, Divine filed a complaint against defendants for malicious prosecution and conspiracy to commit malicious prosecution. The complaint alleged that in spring 2018, Archpriest Manoug demanded Petros pay him $30,000 per month "for his personal expenses," because Petros "owe[d]" him for making Petros "rich" by allowing Petros to build and run the banquet hall. The complaint alleged defendants also demanded Petros fund construction of a new church, and threatened to lock him out of the banquet hall if he did not pay them $5 million.

Divine alleged defendants brought the unlawful detainer action because Petros "refused to comply with their extortionate demands." Divine alleged the unlawful detainer action lacked probable cause because "Archpriest Manoug signed the written leases and *knew* he signed them," yet defendants "deliberately conceal[ed] from the [unlawful detainer court] the existence of the operative 2009 Lease and the superseded 2007 Lease." "Knowing

11

they had no legitimate rights, Defendants brought, maintained and continued to maintain the [unlawful detainer] Action based on repeated lies under oath, in an attempt to unjustly deprive Divine Catering of it[s] rights under the operative 2009 Lease."

Defendants filed an anti-SLAPP motion. Defendants argued the filing of the unlawful detainer action was protected conduct under the anti-SLAPP statute. They further argued Divine could not show their unlawful detainer action lacked probable cause because the unlawful detainer court had found the church entities had "met their prima facie case . . . and proved an oral or de facto tenancy was created in or around 2007." Thus, "the Church Entities had a tenable claim against Divine and had a reasonable basis to pursue the [unlawful detainer] action." Defendants noted that although the unlawful detainer court had concluded the church entities could not evict Divine based on the oral lease, the church entities might have another basis to evict, such as a material breach of the 2009 lease: "[W]hile Divine may have won the 'first round,' the result may be different on the 'second round.' "

Defendants also argued Divine could not satisfy the malice element of malicious prosecution. Defendants noted again the unlawful detainer court's finding the church entities had "met their prima facie case," which, defendants contended, "conclusively establishes the Church Entities were not trying to 'deliberately misuse the legal system' or acted with 'ill will.' " "Divine has not (and cannot) prove the Church Defendants had any ulterior motive to bring the [unlawful detainer] action, other than to recover possession of their property."

Divine argued in opposition that because its malicious prosecution complaint was based on illegal acts of extortion and

perjury, the complaint did not allege activity protected under the anti-SLAPP statute.  Divine further argued the unlawful detainer court's finding that the church entities had met their prima facie burden was based on false information, namely the church entities' contention there were no written leases, and therefore that finding could not establish probable cause.  To demonstrate the unlawful detainer action was brought with malice, Divine pointed to defendants' continued denials of the validity of the written leases despite evidence to the contrary, and a declaration from Petros describing defendants' demands for money, as alleged in the malicious prosecution complaint.

In reply, defendants argued Divine had failed to demonstrate the sort of illegality that would render the unlawful detainer action unprotected under the anti-SLAPP statute.  As for probable cause, defendants invoked the " 'interim adverse judgment' rule," which they contended supported their argument that the unlawful detainer court's finding that the church entities had satisfied their prima facie burden conclusively established probable cause.  Defendants disputed Divine's argument that the unlawful detainer court's finding was based on false information, pointing out that the court made that finding solely based on Petros's testimony, before Archpriest Manoug or anyone associated with the church entities had testified.

Divine filed a surreply arguing defendants waived their argument under the interim adverse judgment rule by raising it for the first time in reply.  Divine further argued the rule did not apply because the prima facie finding was based on fraud or perjury, and the unlawful detainer court's remarks concerning the prima facie finding was not a ruling following an adversary hearing.

## 4.     *Ruling on anti-SLAPP motion*

After hearing argument, the trial court granted the anti-SLAPP motion.  The court found the filing of the unlawful detainer action was not illegal as a matter of law, and therefore it fell within the protections of the anti-SLAPP statute.  The court further agreed with defendants that the unlawful detainer court's finding that the church entities met their prima facie burden triggered the interim adverse judgment rule, thus conclusively establishing probable cause for the unlawful detainer action.[11]

The trial court rejected Divine's argument that the prima facie finding was based on fraud or perjury, because the unlawful detainer court's "decision not to credit the testimony of Manoug Markarian after weighing all the evidence at trial is not the same as a finding of perjury or fraud."  Also, the unlawful detainer court made its prima facie finding "before hearing any purportedly perjurious testimony from [the church entities'] witnesses."  "Thus, any purported perjury or fraud could not have been the basis for that finding by the [unlawful detainer] court."

The trial court further disagreed with Divine that the prima facie finding did not constitute an interim adverse judgment.  The court stated, "[The unlawful detainer] court made a clear finding the Diocese and Church adduced sufficient evidence of an oral agreement for a tenancy to support their claim in the [unlawful detainer] Action.  [Citation.]  That finding was made on the merits after Petros Taglyan was examined by

_____

[11] Because Divine had filed a surreply, the trial court declined to find that defendants had waived their argument under the interim adverse judgment rule by raising it for the first time in their reply.

counsel for the Diocese and Church, as well as counsel for Divine Catering. [Citation.] Accordingly, the [unlawful detainer] court had a 'full adversary hearing' with 'the benefit of a presentation by both sides on the merits of the underlying action' before finding that the Diocese and Church established their so-called 'prima facie case.' [Citation.] Such a finding is sufficient under the circumstances to warrant application of the interim adverse judgment rule."

Having concluded Divine could not show a lack of probable cause, the trial court did not reach the question of whether Divine could prevail on the malice element of malicious prosecution. The court further found Divine's inability to prevail on the malicious prosecution cause of action doomed the cause of action for conspiracy to commit malicious prosecution.

The trial court dismissed Divine's complaint. Divine timely appealed.[12]

## DISCUSSION

### A. The Anti-SLAPP statute

"[T]he anti-SLAPP statute is designed to protect defendants from meritless lawsuits that might chill the exercise of their rights to speak and petition on matters of public concern. [Citations.] To that end, the statute authorizes a special motion to strike a claim 'arising from any act of that person in furtherance of the person's right of petition or free speech under

---

[12] Divine filed two notices of appeal, one from the minute order granting the anti-SLAPP motion and one from the dismissal order. We consolidated the appeals for briefing, argument, and decision.

the United States Constitution or the California Constitution in connection with a public issue.' (§ 425.16, subd. (b)(1).)" (*Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 883–884.) "Acts protected under the statute include, inter alia, 'any written or oral statement or writing made before a . . . judicial proceeding' and 'any written or oral statement or writing made in connection with an issue under consideration or review by a . . . judicial body . . . .' [Citation.]" (*Finato v. Keith A. Fink & Associates* (2021) 68 Cal.App.5th 136, 147, quoting § 425.16, subd. (e)(1), (2).)

"A court evaluates an anti-SLAPP motion in two steps. 'Initially, the moving defendant bears the burden of establishing that the challenged allegations or claims "aris[e] from" protected activity in which the defendant has engaged. [Citations.] If the defendant carries its burden, the plaintiff must then demonstrate its claims have at least "minimal merit." ' [Citation.] If the plaintiff fails to meet that burden, the court will strike the claim." (*Wilson v. Cable News Network, supra,* 7 Cal.5th at p. 884.)

The Supreme Court has described the second step of anti-SLAPP analysis "as a 'summary-judgment-like procedure,' " in which "[t]he court does not weigh evidence or resolve factual claims. Its inquiry is limited to whether the plaintiff has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment. It accepts the plaintiff's evidence as true, and evaluates the defendant's showing only to determine if it defeats the plaintiff's claim as a matter of law. [Citation.] '[C]laims with the requisite minimal merit may proceed.' [Citation.]" (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 384–385.)

16

"We review de novo the grant or denial of an anti-SLAPP motion." (*Sanchez v. Bezos* (2022) 80 Cal.App.5th 750, 763.) "We therefore engage in the same two-step process that the trial court undertakes in assessing an anti-SLAPP motion." (*Billauer v. Escobar-Eck* (2023) 88 Cal.App.5th 953, 962.)

**B.  Divine Has Demonstrated "Minimal Merit" Sufficient To Satisfy the Second Step of Anti-SLAPP Analysis**

As they did below, the parties disagree whether Divine's malicious prosecution complaint arises from conduct protected by the anti-SLAPP statute, the first step of our analysis. Defendants argue their unlawful detainer complaint was by definition a "writing made before a . . . judicial proceeding" (§ 425.16, subd. (e)(1)), and therefore protected. Divine argues its malicious prosecution claim arises from defendants' false denials of the written leases, which Divine characterizes as perjury not entitled to anti-SLAPP protection. We need not resolve this dispute. Assuming arguendo Divine's complaint implicates protected conduct, we conclude Divine nonetheless has demonstrated its complaint has the minimal merit required to proceed, thus satisfying the second step of anti-SLAPP analysis.

The tort of malicious prosecution consists of three elements: "The underlying action must have been: (i) initiated or maintained by, or at the direction of, the defendant, and pursued to a legal termination in favor of the malicious prosecution plaintiff; (ii) initiated or maintained without probable cause; and (iii) initiated or maintained with malice." (*Parrish v. Latham & Watkins* (2017) 3 Cal.5th 767, 775 (*Parrish*).) Defendants do not dispute that Divine, by prevailing in the unlawful detainer action, has established the first element. We therefore limit our discussion to the second and third elements, lack of probable

17

cause and malice, and conclude Divine has made a sufficient showing as to each to overcome defendants' anti-SLAPP motion.

## 1. Divine has made a sufficient showing for anti-SLAPP purposes to establish lack of probable cause

### a. *Applicable law*

The probable cause element of malicious prosecution " 'calls on the trial court to make an objective determination of the "reasonableness" of the defendant's conduct, i.e., to determine whether, on the basis of the facts known to the defendant, the institution of the prior action was legally tenable' . . . . [Citation.]" (*Parrish*, *supra*, 3 Cal.5th at p. 776.) "A claim is unsupported by probable cause only if ' " 'any reasonable attorney would agree [that it is] totally and completely without merit.' " ' [Citations.] 'This rather lenient standard for bringing a civil action reflects "the important public policy of avoiding the chilling of novel or debatable legal claims." ' [Citation.] The standard safeguards the right of both attorneys and their clients ' " 'to present issues that are arguably correct, even if it is extremely unlikely that they will win.' " ' [Citation.]" (*Ibid.*)

In the instant case, the trial court relied on the interim adverse judgment rule to conclude Divine could not demonstrate the church entities' unlawful detainer action lacked probable cause. Under that rule, "a trial court judgment or verdict in favor of the plaintiff or prosecutor in the underlying case, unless obtained by means of fraud or perjury, establishes probable cause to bring the underlying action, even though the judgment or verdict is overturned on appeal or by later ruling of the trial court." (*Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th

18

811, 817; accord, *Parrish*, *supra*, 3 Cal.5th at p. 776.) "This rule reflects a recognition that '[c]laims that have succeeded at a hearing on the merits, even if that result is subsequently reversed by the trial or appellate court, are not so lacking in potential merit that a reasonable attorney or litigant would necessarily have recognized their frivolousness.' [Citation.]" (*Parrish*, at p. 776.)

Despite its name, the interim adverse judgment rule is triggered not only by final judgments after trial, but also " 'denial of defense summary judgment motions, directed verdict motions, and similar efforts at pretrial termination of the underlying case' " (*Parrish*, *supra*, 3 Cal.5th at pp. 776–777), even if the plaintiff ultimately loses the case. (See *id*. at p. 771 [denial of defense summary judgment motion triggered interim adverse judgment rule although defendants prevailed at trial].) "[T]hese events constitute proof that the prior lawsuit was not 'totally and completely without merit' because," for example, "a judge found there to be 'triable issue[s] . . . [of] material fact' for a jury to resolve [citations], or a judge found there to be ' "evidence of sufficient substantiality to support a verdict" ' in the plaintiff's favor [citations]." (*Hart v. Darwish* (2017) 12 Cal.App.5th 218, 226–227 (*Hart*).)

The interim adverse judgment rule does not apply if the interim judgment or ruling "rest[s] 'solely on technical or procedural grounds,' " rather than reaching the merits of the case. (*Parrish*, *supra*, 3 Cal.5th at p. 778.) "And even where a ruling is based on the court's evaluation of the merits of the claim, the ruling does not establish the existence of probable cause if the ruling is 'shown to have been obtained by fraud or perjury.' [Citation.]" (*Ibid*.)

19

### b. The unlawful detainer court's comments regarding the church entities' prima facie showing did not constitute an "interim adverse judgment"

Here, the trial court found that the unlawful detainer court's statements that the church entities had satisfied their prima facie burden to establish the existence of an oral lease constituted a ruling sufficient to trigger the interim adverse judgment rule. The trial court cited to *Hart*, which applied the interim adverse judgment rule based on the denial of a defendant's section 631.8 motion for judgment at the close of a plaintiff's case-in-chief.[13] (*Hart, supra,* 12 Cal.App.5th at p. 227.)

*Hart* explained: "A motion for judgment is to be granted if the court concludes, after 'weighing the evidence at the close of the plaintiff's case,' that 'the plaintiff has failed to sustain the burden of proof.' [Citations.] Such a conclusion ' " 'dispense[s] with the need for the defendant to produce evidence. [Citations.]' " ' [Citation.] By negative implication, the denial of a motion for judgment necessarily embodies a finding that the plaintiff *has* sustained its burden of proof, at least enough to

---

[13] Section 631.8 provides, in relevant part, "After a party has completed his presentation of evidence in a trial by the court, the other party, without waiving his right to offer evidence in support of his defense or in rebuttal in the event the motion is not granted, may move for a judgment. The court as trier of the facts shall weigh the evidence and may render a judgment in favor of the moving party, in which case the court shall make a statement of decision as provided in Sections 632 and 634, or may decline to render any judgment until the close of all the evidence." (§ 631.8, subd. (a).)

20

continue with the trial and to permit the defendant to present contrary evidence. If a prior judicial finding that a plaintiff has presented triable issues of material fact or evidence of sufficient substantiality to support a verdict is enough to constitute proof that the plaintiff's lawsuit is legally tenable, so too is a prior judicial finding that the plaintiff has presented sufficient evidence to sustain its burden of proof at the close of its case-in-chief." (*Supra*, 12 Cal.App.5th at p. 227.)

Unlike in *Hart*, the unlawful detainer court in the instant case never denied a motion for judgment, nor indeed denied any dispositive motion at all. The trial court nonetheless found the unlawful detainer court's statements that the church entities had made their prima facie case was a "finding . . . made on the merits" for purposes of the interim adverse judgment rule. The trial court further found that finding was made after a " 'full adversary hearing' with 'the benefit of a presentation by both sides on the merits of the underlying action,' " because the unlawful detainer court made its finding after counsel for Divine and Petros and counsel for the church entities had had the opportunity to examine Petros.

In so ruling, the trial court expanded the range of events that trigger the interim adverse judgment rule to include not only actual judgments and rulings on motions, but also, in this case, statements made sua sponte by the unlawful detainer court during examination of a witness. We have found no published decision endorsing such an extension, nor do we think such an extension is warranted either under the specific facts of this case or the law.

As a starting point, we disagree with the trial court's analogizing the unlawful detainer court's statements regarding

21

the church entities' prima facie case to a finding on the merits following a full adversary hearing.  There was no adversary hearing—although both sides had asked questions of Petros,[14] the unlawful detainer court neither invited nor heard argument before making the remarks on which defendants rely.  Nor would we expect the unlawful detainer court to have invited argument given that no one had made a motion, the parties had not completed their examination of Petros, and the church entities had not rested their case-in-chief.  The more accurate reading of the unlawful detainer court's statements is that it was providing its assessment of the case as of that point in time to guide the parties in their presentation of evidence, advising them to focus on the written lease as the key issue rather than how and with whom the original tenancy was formed.

Even assuming arguendo the parties' had delivered arguments as they would have in an adversary hearing, we conclude it was error, as a matter of law, for the trial court to extend the interim adverse judgment rule beyond an actual judgment or ruling on a formal motion.  Extending the interim adverse judgment rule as the trial court did is contrary to the principle that a court's oral comments during trial are inherently tentative, and generally have no preclusive effect for any purpose.  This is why, for example, "a court's oral comments may

_____

[14] We note the unlawful detainer court stated the church entities had satisfied their prima facie case *before* counsel for Divine and Petros had begun her examination of Petros.  The unlawful detainer court, however, echoed this statement after counsel for Divine and Petros had examined Petros, and it is those later statements upon which the trial court relied in granting the anti-SLAPP motion.

be valuable in illustrating the trial judge's theory, but they may never be used to impeach the order or judgment on appeal. [Citation.] This is because a trial court retains inherent authority to change its decision, its findings of fact, or its conclusions of law at any time before entry of judgment and then the judgment supersedes any memorandum or tentative decision or any oral comments from the bench." (*Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 268.) This principle is essential to the effective conduct of trials—trial courts must have the freedom to comment on the law and evidence to guide the presentations of the parties without fear that those comments will limit or otherwise be used against the court or the parties in the future.

Also, to the extent trial events short of a final judgment trigger the interim adverse judgment rule, as a matter of fairness, those events should be limited to rulings invited by a party via a formal motion. When a defendant brings a dispositive motion, the defendant makes a strategic decision to risk the possibility of foreclosing a future malicious prosecution action in hopes of hastening resolution of the case. If a dispositive motion seems unlikely to succeed, the defendant may forgo bringing it to avoid losing the option of suing for malicious prosecution. The trial court's anti-SLAPP ruling in this case deprived Divine of that choice by foreclosing a malicious prosecution action merely based on the unlawful detainer court's sua sponte remarks in the middle of a witness's testimony, even though Divine never made a motion or otherwise invited those remarks.

Further, because adverse interim rulings on the merits have the powerful effect of foreclosing a defendant's remedy of a malicious prosecution action, there should be no ambiguity as to

when the trial court has made such a ruling.  When the trial court denies a dispositive motion, it is clear to the parties and to future courts that the trial court has made a formal determination regarding the law and the evidence.  Were we to affirm the trial court in this case, we would turn a bright line rule into a source of endless dispute as parties scrutinize trial transcripts to determine if the trial court's comments constituted a formal ruling on the merits regarding the law and the evidence.

For all these reasons we hold the unlawful detainer court's oral statements regarding the church entities' prima facie case did not constitute a judgment or ruling for purposes of triggering the interim adverse judgment rule.

### c.   *Alternatively, Divine has demonstrated sufficiently the finding regarding the church entities' prima facie case was the product of fraud or perjury*

Assuming arguendo the unlawful detainer court's statements regarding the church entities' prima facie showing constituted a ruling sufficient to trigger the interim adverse judgment rule, Divine has made a sufficient showing that those statements were the product of fraud or perjury.

The fraud or perjury exception to the interim adverse judgment rule applies when the prior adverse ruling " 'was induced by materially false facts,' " and "the person making the allegedly false statements ' "knew, or, in the exercise of reasonable diligence should have known, that his representations were false." ' [Citation.]" (*Kinsella v. Kinsella* (2020) 45 Cal.App.5th 442, 463 (*Kinsella*); see *Parrish*, *supra*, 3 Cal.5th at p. 782 ["when a litigant relies on evidence that she knows to be false, she is not entitled to reap the benefits of the interim

24

adverse judgment rule by deceiving a court into believing that her claim has merit"].)[15]

To defeat an anti-SLAPP motion based on the fraud/perjury exception to the interim adverse judgment rule, a plaintiff need not *prove* the adverse judgment or ruling was obtained by fraud or perjury. (See *Kinsella*, *supra*, 45 Cal.App.5th at p. 457.) Consistent with the standard at the second step of anti-SLAPP analysis, the plaintiff need only offer evidence that "establish[es] a prima facie factual showing that the fraud exception applies." (*Ibid.*) In assessing that showing, we accept that evidence as true and draw "all favorable inferences therefrom." (*Id.* at p. 459.)

Divine has made that showing here. Divine relies on the same evidence presented in the unlawful detainer trial establishing the existence of a written lease signed by Archpriest Manoug, including the testimony of the liquor license consultant, the former Divine employee, the immigration law paralegal, the handwriting expert, and Gary Taglyan. Based on this evidence, the unlawful detainer court ruled the written lease superseded any prior oral arrangement between Petros and the church entities.

Despite this written lease, the church entities contended below in their verified unlawful detainer complaint that the parties were governed by an oral month-to-month lease. They did not disclose the existence of the written lease to the unlawful detainer court, and indeed in their discovery responses denied such a lease existed.

---

[15] *Parrish* made clear, however, that *inadvertent* reliance on " 'materially false facts' " does not constitute fraud or perjury for purposes of the exception to the interim adverse judgment rule. (*Parrish*, *supra*, 3 Cal.5th at p. 782.)

Accepting Divine's evidence as true, and drawing all favorable inferences from that evidence, Divine has made a prima facie showing that defendants knew or should have known that St. John's head priest had signed a written lease that superseded the prior oral arrangement, yet they concealed the existence of that lease. Had defendants disclosed the written lease to the unlawful detainer court, that court obviously never would have concluded the church entities had made a prima facie showing that they could evict based on a month-to-month oral lease. Thus, Divine has made a sufficient showing for anti-SLAPP purposes that the unlawful detainer court's findings regarding the oral lease were the result of defendants' fraud.

In ruling to the contrary, the trial court noted, as do defendants on appeal, that the unlawful detainer court made no findings of fraud or perjury, stating, "[The unlawful detainer] court's decision not to credit the testimony of Manoug Markarian after weighing all the evidence at trial is not the same as a finding of perjury or fraud." The fraud/perjury exception, however, does not depend on particular findings by the court in the underlying action, but on the evidence to be presented in the malicious prosecution action. As we have explained, accepting Divine's evidence as true and drawing all favorable inferences therefrom, Divine has made a sufficient showing of defendants' fraud.

The trial court also rejected the fraud/perjury exception because the unlawful detainer court made its statements about the church entities' prima facie case based solely on Petros's testimony, before Archpriest Manoug had testified. This overlooks the fact that defendants had alleged in their verified complaint that the operative lease was oral and month-to-month,

26

and had denied the existence of the written lease in their discovery responses. Had they not done so, the unlawful detainer court certainly would have reached a different conclusion regarding the church entities' prima facie case for eviction.

### d. Defendants' anti-SLAPP motion offered no other basis to establish probable cause for the unlawful detainer action

Apart from their reliance on the unlawful detainer court's statements regarding their prima facie case, defendants offered no other argument in their anti-SLAPP motion that Divine could not show lack of probable cause, nor did the trial court offer any other basis.

Divine notes in its reply brief that, in addition to denying the existence of the written lease, the church entities raised alternative arguments in the unlawful detainer court, including that Archpriest Manoug lacked the authority to enter into the lease. Divine contends, however, that it is entitled to bring a malicious prosecution action based on defendants' allegedly false denial of the existence of the written lease, even assuming arguendo there was probable cause to assert defendants' other challenges to the lease. Divine cites *Crowley v. Katleman* (1994) 8 Cal.4th 666, which held that a complaint for malicious prosecution arising from a will contest would lie "even though it does not allege that every one of the grounds asserted in the will contest lacked probable cause." (*Id.* at p. 679; see *Bertero v. National General Corp.* (1974) 13 Cal.3d 43, 57, fn. 5 ["an action for malicious prosecution lies when but one of alternate theories of recovery is maliciously asserted"].)

We need not decide whether Divine is correct in its reliance on *Crowley*, because defendants did not argue in their anti-

SLAPP motion that their alternative bases to challenge the lease established probable cause to bring the unlawful detainer action—again, their sole argument turned on the unlawful detainer court's remarks regarding their prima facie showing of an oral month-to-month lease. Nor do they raise additional arguments on appeal.

We therefore hold that Divine has made an adequate showing for anti-SLAPP purposes that the unlawful detainer action lacked probable cause.

## 2. Divine has made an adequate showing of malice

The malice element of malicious prosecution refers to " 'the defendant's subjective intent in initiating the prior action.' [Citations.] '[M]alice is present when proceedings are instituted primarily for an improper purpose. Suits with the hallmark of an improper purpose are those in which . . . " '. . . the person initiating them does not believe that his claim may be held valid [or] the proceedings are begun primarily because of hostility or ill will . . . .' " ' [Citation.] 'Since parties rarely admit an improper motive, malice is usually proven by circumstantial evidence and inferences drawn from the evidence.' [Citation.] '[M]alice can be inferred when a party *continues* to prosecute an action after becoming aware that the action lacks probable cause.' [Citations.]" (*Cuevas-Martinez v. Sun Salt Sand, Inc.* (2019) 35 Cal.App.5th 1109, 1122.)

In granting defendants' anti-SLAPP motion, the trial court did not reach the malice element, having found Divine had failed to establish a lack of probable cause. Under de novo review of the record, however, we conclude Divine has satisfied its showing as to that element.

28

Divine offered a declaration from Petros Taglyan in which he described a 2018 incident in which Archpriest Manoug demanded Petros pay him "$30,000 per month for his personal expenses," with the archpriest "ranting 'you owe me' for making 'you rich.'" Petros further declared that later that year he received a letter on church letterhead from Archpriest Manoug, Harout Makarian, "and other members of the Diocesan and/or Church Parish Council, demanding that I pay for the new church construction since the Church and Diocese had no money." Petros claimed to have objected to this request, asking the archpriest and Harout Markarian "why they were trying to extort me," after which "a member of the Diocese and Church personally came to my house to deliver a message that the Diocese and Church would lock me out of the banquet hall if I did not pay them $5 million."

Assuming again that Divine's evidence is true, and drawing all favorable inferences therefrom, Petros's declaration, combined with the evidence that defendants knowingly concealed the existence of the written lease, is sufficient to make a prima facie showing that defendants brought the unlawful detainer action for a wrongful purpose, either to compel Petros to pay additional monies to which they were not entitled, or to punish him for refusing to do so.

Defendants do not address the malice element in their appellate briefing. In their anti-SLAPP motion, their only response to Divine's evidence was the conclusory statement that "Divine's claim fails to prove the essential element of actual 'malice'; an element that requires proof of each Defendant's subjective hatred or actual animus." Petros's declaration makes a prima facie showing of animus on the part of Archpriest

Manoug and Harout Markarian, and by extension the entities they represent, the Diocese and St. John.

Divine thus has shown its cause of action for malicious prosecution has the minimal merit necessary to overcome defendants' anti-SLAPP motion.

### 3. Defendants offer no valid basis to strike the cause of action for conspiracy to commit malicious prosecution

Because the trial court found Divine had failed to make a prima facie showing of malicious prosecution, the trial court further found Divine could not make a showing of conspiracy to commit that tort. Our holding that Divine adequately established the elements of malicious prosecution for anti-SLAPP purposes undercuts the trial court's rationale.

Defendants offer no other valid basis to strike the cause of action for conspiracy. In their original anti-SLAPP filing, defendants did not address the cause of action for conspiracy at all. In their reply in support of the anti-SLAPP motion, they argued they were immune under the litigation privilege (Civ. Code, § 47, subd. (b)), an argument they repeat on appeal. As defendants conceded below, however, the litigation privilege is not a defense to claims of malicious prosecution. (*RGC Gaslamp, LLC v. Ehmcke Sheet Metal Co., Inc.* (2020) 56 Cal.App.5th 413, 435.)

On appeal, defendants also quote *Doctors' Co. v. Superior Court* (1989) 49 Cal.3d 39, 44, for the proposition that " 'A cause of action for civil conspiracy may not arise . . . if the alleged conspirator, though a participant in the agreement underlying the injury, was not personally bound by the duty violated by the wrongdoing and was acting only as the agent or employee of the

30

party who did have that duty.'" Apart from this quotation, defendants do not explain the relevance of *Doctors' Co.*, and we therefore do not address that opinion. (See *In re Tobacco Cases II* (2015) 240 Cal.App.4th 779, 808 [failure to provide argument may be treated as waiver of an issue].)[16]

## DISPOSITION

The orders granting the special motion to strike and dismissing the complaint are reversed, and the matter remanded for further proceedings. Appellant is awarded its costs on appeal.

<u>CERTIFIED FOR PUBLICATION.</u>


BENDIX, J.

We concur:


ROTHSCHILD, P. J.


CHANEY, J.

---

[16] Divine states that while this appeal was pending, the trial court awarded attorney fees to defendants predicated on the grant of the anti-SLAPP motion. Divine asks that we reverse the fee award. The fee award is not before us in this appeal and we do not address it.